WILLIAM JHAVERI-WEEKS (SBN 289984)
wjw@jhaveriweeks.com
SARAH ABRAHAM (SBN 326098)
sa@jhaveriweeks.com
ALLY N. GIROUARD (SBN 336625)
ag@jhaveriweeks.com
THE JHAVERI-WEEKS FIRM, P.C.
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 463-8097
Facsimile: (415) 367-1439

*Attorneys for Plaintiff Dmitriy Viner*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DMITRIY VINER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>THE TOMORROW COMPANIES INC. and STEPHEN GREGORIO,<br><br>　　　　　　Defendants. | Case No.  **'23CV0063 MMA BLM**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED**<br><br>　**(1) Fraudulent Misrepresentation**<br>　**(2) Negligent Misrepresentation** |

1
COMPLAINT

Plaintiff Dmitriy Viner complains and alleges as follows:

## INTRODUCTION

1. Defendant Stephen Gregorio, Chief Financial Officer of Defendant The Tomorrow Companies Inc. ("Tomorrow" or the "Company") induced Plaintiff to leave his job and join the Company by lying to Plaintiff about Tomorrow's assets. Specifically, when recruiting Mr. Viner in August and October 2021, Mr. Gregorio repeatedly told him that the Company had $200 million in cash from which it would be funding Mergers and Acquisitions ("M&A") deals that Plaintiff would oversee if he joined the Company. Based on those representations, Mr. Viner left his job and joined the Company. Several months later, Tomorrow would state in financials filed with the SEC that "Our cash and cash equivalents and marketable securities as of September 30, 2021 was $100 million."

2. The Company attempted to go public through a Special Purpose Acquisition Company ("SPAC") merger transaction shortly after hiring Plaintiff. The SPAC effort failed, and without the $200 million in assets that Mr. Gregorio had claimed, the Company lacked the resources to engage in M&A, so it terminated Plaintiff without fault only six months after hiring him.

3. Tomorrow's false statements induced Plaintiff to leave an eight-year finance career at his previous employer, and to walk away from significant equity there. If Mr. Gregorio had not lied about Tomorrow's cash balance, Plaintiff would not have joined Tomorrow, would not have lost his compensation at his previous employer, and would not currently be out of work. The Company's misconduct has caused significant harm to Plaintiff's finances and career trajectory.

## PARTIES

4. Mr. Viner is a resident of San Diego County in the State of California. He was recruited by Defendants while he was in San Diego County, and the misrepresentations complained of were made to him while he was in San Diego County.

5.  Defendant Tomorrow is a Delaware Corporation with its principal place of business in Boston, Massachusetts.

6.  Defendant Stephen Gregorio is a resident of Massachusetts.

## VENUE AND JURISDICTION

7.  This Court has subject matter jurisdiction because the Parties are diverse under 28 U.S.C. § 1332(a)(1) and the amount in controversy exceeds $75,000.

8.  Venue is proper in this Court and this Division under 28 U.S.C. § 1391(b) because the misrepresentations complained of were made to Plaintiff in San Diego County, and based on those misrepresentations, he left his job in San Diego County to work for Defendant Tomorrow in San Diego County.  The harm he experienced occurred entirely in San Diego County.

## FACTS

9.  In August 2021, Tomorrow began interviewing Mr. Viner for the position of Director of Corporate Development, a new role at the Company created for overseeing its corporate mergers and acquisitions program.  Up to that point, Tomorrow had engaged in only one small acquisition, which (Mr. Viner later learned) it had botched due to inexperience.  Adding someone with Mr. Viner's M&A experience would have been extremely valuable to the Company – at least, assuming its undisclosed upcoming SPAC fundraise was successful and the Company actually obtained the funds needed to do additional deals (funds that Mr. Gregorio claimed to Mr. Viner it already had available).

10.  The interview process took place remotely over the course of several months.  Mr. Viner first spoke on the phone with Mr. Gregorio on August 24, 2021.  On that call Mr. Viner asked directly: "What's your cash position?  Do you have cash to do deals?"  Mr. Gregorio said "We have $200 million in cash."  Based on that representation, Mr. Viner was interested in the position.

11.  When Mr. Viner spoke with Mr. Gregorio again on October 8, 2021, he again asked about the Company's cash position, expressing that he wanted

confirmation that the Company had sufficient cash to do deals. Again, Mr. Gregorio stated that Tomorrow had "$200 million in cash." Mr. Gregorio told Mr. Viner that the Company had many prospective deals in the pipeline and a $200 million cash position from which it could fund such deals. Mr. Viner and Mr. Gregorio had additional calls before Mr. Viner accepted the position on October 27, 2021, and in at least one of those calls, Mr. Gregorio again mentioned the $200 million cash figure. Specifically, when Mr. Viner discussed the Offer Letter and its severance provision with Mr. Gregorio on October 26, 2021, Mr. Viner asked "Are you sure we are not going to run out of money in six months?" As before, Mr. Gregorio stated that the Company had $200 million in cash.

12. Contrary to Mr. Gregorio's assertions, Tomorrow had only $100 million in cash as of September 30, 2021. Mr. Gregorio did not reveal that Tomorrow's existing cash was only sufficient to fund its core operations (headcount and satellite installation) for one year, with no funds to devote to acquisitions, and no funds devoted to deals in its Plan of Record later filed with the SEC. Mr. Gregorio did not reveal that the Company's ability to engage in mergers and acquisitions was contingent upon a potential SPAC transaction just months later in early 2022.[1]

13. Mr. Viner also interviewed by phone with Tomorrow's Chief Executive Officer, Shimon Elkabetz. Mr. Elkabetz also would have been familiar with the Company's cash position, its one-year runway, and its upcoming SPAC merger effort, yet Mr. Elkabetz did not disclose to Mr. Viner that the Company would not be able to engage in mergers or acquisitions unless its upcoming SPAC merger was successful.

14. Mr. Viner interviewed with another officer of the Company and asked her the Company's cash balance to attempt to verify what he had been told; she

---

[1] Mr. Gregorio also told Mr. Viner that the Company's annual revenues were $30 million. This also was not true: the Company's investor material projected only $11 million in revenues for 2021 as of September 30, 2021.

referred him to Mr. Gregorio.

15. Based on Mr. Gregorio's representation of a $200 million cash balance, and based on the Company's headcount and several other factors, Mr. Viner performed his own rough calculations and determined that he was willing to leave his position at his previous employer, where he had been working on acquisitions for the past eight years, to oversee deals at Tomorrow. He agreed to a compensation package that included significant equity compensation subject to a four-year vesting schedule. He started his position at Tomorrow on November 29, 2021, working remotely from San Diego.

16. During the first week on the job, Mr. Gregorio called Mr. Viner into his office and revealed to him for the first time that the Company was planning to attempt to go public through a SPAC in the coming months, and that although work on potential acquisitions could continue, including issuance letters of intent and due diligence of potential targets, the closing of the SPAC could be a potential closing condition for contemplated transactions. Mr. Viner worked on analyzing potential transactions and facilitating M&A-related activities, including preparing and executing term sheets and aligning vendors to facilitate deal execution to take place after the SPAC effort was (hopefully) successful.

17. In February 2022, to Mr. Viner's surprise, Mr. Elkabetz communicated to the executive team that Tomorrow had no funding for M&A vendor expenses and that all M&A activity should be put on hold. Mr. Viner and Mr. Gregorio discussed Mr. Elkabetz's statements, and Mr. Gregorio informed Mr. Viner for the first time that any M&A deal flow would be contingent on obtaining another round of funding. In March 2022, the SPAC transaction failed. Tomorrow terminated Mr. Viner on May 31, 2022 due to the Company's lack of cash to support acquisition activity.

18. As Mr. Viner began attempting to understand how the Company's financial position had fallen so far and so quickly from the $200 million in cash Mr. Gregorio had cited during his interviews, he identified information in December 2021

SEC filings for the SPAC that revealed that Mr. Gregorio had lied to him about the Company's cash balance.

19. Specifically, the SPAC filed a Form S-4 Registration Statement on December 17, 2021 containing financials provided by Tomorrow stating: "Our cash and cash equivalents and marketable securities as of September 30, 2021 was $100 million." This was confirmed by other filings, including a December 2021 presentation to Pine Technology Acquisition Corporation stating that cash on balance sheet was $102 million as of September 30, 2021.

20. The filings included Tomorrow's Plan of Record revealing that the Company expected cash burn of $87 million in 2022, with that figure covering only core operations and no acquisitions. Thus, at the time it induced Mr. Viner to leave his previous employer and join Tomorrow, the Company knew that unless the imminent SPAC effort was successful, it would not have the funds to carry out the work Mr. Viner was expecting to do. Mr. Gregorio and Mr. Elkabetz hid that information, and Mr. Gregorio, who monitored the Company's cash balance weekly, falsely stated that the Company had $200 million in cash from which it could fund a significant pipeline of deals.

21. Through no fault of his own, and as a direct result of the Company's dishonesty, Mr. Viner has been out of work for approximately seven months, and continues to be out of work, with no salary, no benefits, and none of the unvested equity he had earned at his previous employer. Positions at his level require lengthy interview processes and are not easy to come by. He has been placed in a difficult and extremely emotionally distressing situation.

## FIRST CAUSE OF ACTION

**Fraudulent Misrepresentation**
**(Against both Defendants)**

22. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

23. It is unlawful for an employer to make a false representation to induce a prospective employee to accept employment. Cal. Civ. Code § 1709 ("One who willfully deceives another with intent to alter his position to his injury or risk, is liable for any damage which he thereby suffers.").

24. Defendant Gregorio repeatedly represented to Plaintiff, on the dates set forth above, that the Company had $200 million in cash from which could fund deals when, in fact, it had only $100 million. He also failed to disclose that the Company would not be able to engage in M&A activity unless an imminent fundraising effort was successful.

25. Mr. Elkabetz also failed to disclose that the Company would not be able to engage in M&A activity unless an imminent fundraising effort was successful.

26. At the time Mr. Gregorio made the foregoing false statements, he knew that the statements were false. Mr. Gregorio was the Chief Financial Officer ("CFO"). As the CFO, he checked the Company's cash balance on a weekly basis, and he was intimately familiar with the Company's finances.

27. At the time of Mr. Elkabetz's omission, he was intimately familiar with the Company's finances.

28. Mr. Gregorio and Mr. Elkabetz intended to induce Plaintiff's reliance on the false representations and misleading omissions. Plaintiff repeatedly asked Mr. Gregorio about the Company's cash position. Plaintiff expressed that he wanted to know this information because it was a key factor in his decision-making process. Plaintiff reasonably relied on Mr. Gregorio's statements.

29. Defendant Tomorrow is liable for Mr. Gregorio's and Mr. Elkabetz's conduct based on the doctrine of respondeat superior and based on their role as agents and officers of the Company.

30. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

31. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

32. Plaintiff is entitled to punitive damages from Defendants in an amount according to proof. In committing the acts described above, Defendants were guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by the Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294. As CFO and CEO, Mr. Gregorio and Mr. Elkabetz were managing agents of the Company.

## SECOND CAUSE OF ACTION
### Negligent Misrepresentation
### (Against both Defendants)

33. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

34. It is unlawful to make a false statement without reasonable grounds for believing the statement to be true. *Nat'l Union Fire Inc. Co. v. Cambridge Integrated Servs. Grp., Inc.* (2009) 171 Cal.App.4th 35, 50.

35. Mr. Gregorio had no reasonable grounds for believing his false statements to be true when he made them.

36. Defendant Gregorio intended to induce Plaintiff's reliance on the statements.

37. Plaintiff reasonably relied on Defendant Gregorio's representations.

38. Defendant Tomorrow is liable for Mr. Gregorio's and Mr. Elkabetz's conduct based on the doctrine of respondeat superior and based on their role as agents and officers of the Company.

39. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other

employment benefits and has incurred other economic losses.

40. As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against each Defendant as follows:

1. For compensatory damages, including but not limited to, lost pay, benefits, equity, and perquisites he lost and continues to lose because Tomorrow induced him to leave his job to work for Tomorrow, as well as damages for emotional distress and pain and suffering, according to proof allowed by law;

2. For punitive damages;

3. For an award of interest (including pre-judgment and post-judgment interest) as allowed by law; and

4. For such further legal and equitable relief as the Court deems just and proper.

DATED: January 12, 2023         THE JHAVERI-WEEKS LAW FIRM, P.C.

By: *s/ William C. Jhaveri-Weeks*
    William C. Jhaveri-Weeks
    Sarah Abraham*
    Ally N. Girouard*

*Attorneys for Plaintiff*

*Admission to Southern District of California anticipated shortly.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests trial by jury on all causes of action so triable.

DATED:  January 12, 2023　　　　THE JHAVERI-WEEKS LAW FIRM, P.C.

By: *s/ William C. Jhaveri-Weeks*
　　　William C. Jhaveri-Weeks

*Attorneys for Plaintiff*